In the Matter of SOUTHERN LAND TITLE CORPORATION, Debtor, in Proceedings for the Reorganization of a Corporation.

In re Southern Land Title Corporation, Five Flags Building, Inc., Puritan Oil & Gas of New England, Inc., Sotan, Inc., and Bourbon Kings Hotel Corporation.

No. 67–135.

United States District Court
E. D. Louisiana,
New Orleans Division.

Nov. 6, 1968.

See also, D.C., 301 F.Supp. 379, 431.

Cicero C. Sessions, Sessions, Fishman, Rosenson, Snellings & Boisfontaine, J. B. Kiefer, Graham & Graham, New Orleans, La., for Leonard R. Spangenberg, Jr., and others, petitioning creditors.

James J. Morrison, New Orleans, La., for bankrupt debtor corporation.

Jerry A. Brown, Monroe & Lemann, New Orleans, La., for National Bank of North America (formerly Meadow Brook National Bank).

Donald Zuber, Seale, Smith, Baine & Phelps, Baton Rouge, La., for National American Life Insurance Co.

Tom H. Matheny, Pittman & Matheny, Hammond, La., for Bowl-Opp, Inc. and American Machine & Foundry Co.

W. Ford Reese, Adams & Reese, Harold J. Zeringer, Jr., Zeringer & Zeringer, New Orleans, La., for Gulf South Realty Corporation and Leon Poirier.

Harry T. Howard, III, Chaffe, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., for Dr. Francis E. LeJeune.

Clem H. Sehrt, Peter J. Butler, Sehrt, Boyle & Wheeler, New Orleans, La., for National American Bank of New Orleans and Bankers Union Life Ins. Co., of Denver, Colorado.

Meyer L. Dresner, Dresner & Dresner, New Orleans, La., for H-Tide Realty Corp.

Moise S. Steeg, Jr., Rader Jackson, Steeg & Shushan, New Orleans, La., for Douglas L. Black and Estate, Inc.

Leo S. Roos, Roos & Roos, New Orleans, La., for Exchange National Bank of Chicago and Finger Contract Supply.

Joseph E. Friend, Dodge & Friend, New Orleans, La., for American Acceptance Corp.

J. Barnwell Phelps, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Albert A. List and Hibernia National Bank.

Frank L. Micholet, Bernard, Micholet & Cassisa, New Orleans, La., for Sun Life Assurance Company of Canada and Mrs. Virginia Raspanti Ajubita.

Clifton S. Carl, Garrett & Carl, New Orleans, La., for National Cash Register Co.

## MEMORANDUM OPINION AND ORDER

HEEBE, District Judge.

On March 19, 1968, the trustee filed a petition seeking to dismiss the proceedings as to Five Flags Building, Inc. or to adjudicate that corporation bankrupt and place it in ordinary bankruptcy, all pursuant to § 236(2) of the Bankruptcy Act, 11 U.S.C. § 636(2). On April 1, 1968, the trustee filed three similar petitions with respect to Southern Land Title Corporation, Puritan Oil & Gas of New England, Inc., and Place Vendome, Inc. The hearing on all four petitions was held on April 22, 1968. The debtor corporations opposed the trustee's petitions arguing basically that the Franchard Corporation was engaged in negotiations at that time with an eye toward an "englobo" reorganization of all of the debtor corporations. Having experienced failure in several prior attempts to work out a plan to reorganize the debtor corporations "englobo," the Court was quite reluctant to continue these proceedings on the basis of the Franchard negotiations. However, after meeting with representatives of that corporation and discussing the matter with them, the Court was impressed with the seriousness of their negotiations as well as Franchard's financial ability and business acumen. Consequently, the Court took the trustee's petitions under advisement pending the outcome of the Franchard negotiations fully intending to grant the trustee's petitions in the event that the negotiations failed. The negotiations did fail, and the Franchard Corporation was unable to offer a proposal to serve as the basis for a plan of reorganization. Another development occurred at about the same time, however, which drastically altered the circumstances, and in light of the changed circumstances, it would have been most imprudent for the Court to act on the trustee's petitions even though the Franchard negotiations failed.

The new development which placed the reorganization chances in a completely different posture was closely related to the trustee's § 236(2) petitions. On February 2, 1968, the trustee had filed a petition to disclaim the property known as the Le Richelieu Hotel. A hearing on that petition was set for February 19, 1968, at which time the petition was continued without date due to the hope that an "englobo" plan of reorganization could be worked out with financial support provided by one K. K. Basu through his various associates and interests. This proved futile, and on April 9, 1968, the trustee's petition to disclaim Le Richelieu Hotel was set for the same date as his § 236(2) petitions. The hearing on the disclaimer was heard on April 22, 1968, after the hearings on the various § 236(2) petitions and was continued over to May 6, 1968. On May 6, 1968, when the hearing on the disclaimer was

resumed, counsel for the debtor corporations filed a motion and memorandum in opposition to both the disclaimer and the § 236(2) petitions which had previously been heard. The basis of the objection was, essentially, that the transfer of the building at 225 Baronne Street in September of 1966 from Five Flags Building, Inc., one of the debtor corporations, to its present owner was a preferential or fraudulent transfer. This charge came as a complete surprise to both the trustee and the Court as the information supporting the charge had never been made known to the trustee, and he obviously had no reason to suspect it prior to the disclosure of the previously withheld inside information. If the charge were true, however, and the building could be reclaimed for the debtor estate, it would greatly enhance the possibilities of successfully reorganizing the debtor corporations because the building, valued at approximately sixteen million dollars and producing an annual gross rental of approximately $2,000,000, is an extremely valuable piece of property. The trustee, acting upon these allegations immediately, filed a petition pursuant to §§ 21 and 167 of the Bankruptcy Act, 11 U.S.C. §§ 44, 567, for an examination of various persons having knowledge of the facts surrounding the transfer of the building and requested that they produce all documentary evidence relating to the transfer. The Court signed an order on May 9, 1968, ordering the various persons to appear in Court on May 23, 1968, to testify concerning the transfer and to produce at that time all records, documents and other memoranda that they possessed relating to the transfer. On May 20, 1968, the trustee's attorney secured additional information from counsel for the debtor corporations as to other persons and documents relating to the transfer of the building, and on the same day secured an order from the Court ordering those persons to also appear and the production of those documents at the May 23 hearing. The matter was heard on May 23, 1968, as scheduled, and was continued over to May 24, 1968. At the hearing on

May 24, it was agreed by counsel for the trustee, counsel for the debtor corporations, and counsel for the present owner of 225 Baronne Street to convert the hearing into a trial of title to the building and the land upon which it is situated, as well as the "Goldberg Properties," which relates to the proceedings of the Plaza Towers, Bankruptcy No. 66–995, and not to these proceedings. The reclamation suit was then heard on May 24, 25, 27 and 28, 1968, and was continued to a pre-trial conference to be held in chambers on June 11, 1968. Various matters were discussed at the pre-trial conference on June 11, 1968, and the trial was set to be resumed on June 24, 1968, with another pre-trial conference scheduled for June 18, 1968.

Prior to the pre-trial conference on June 18, 1968, the Court took ill, suffering severe fatigue, and consequently was forced to cancel all matters on the docket, including the reclamation suit, until September 1968. During that period, the Court, unfortunately, was unable to hear any of the many matters pending on the docket whatsoever, although various orders presented *ex parte* were signed. Upon the Court's resumption of activity in September, a minute entry was entered on September 5, 1968, setting the resumption of the reclamation suit for October 21, 22, and 24, 1968. The suit was heard on those days as scheduled, and was continued over until November 4 and 5, 1968.

The trustee's petitions under § 236(2), which were heard on April 22, 1968, were taken under advisement. While the original reason for declining to rule upon the trustee's petitions, the Franchard negotiations, has long since dissipated, the Court would have had to ignore the very purpose of Chapter X, as well as the jurisprudence thereunder, see, e. g., In Re American Bantam Car Co., 193 F.2d 616 (3rd Cir. 1952), to grant the trustee's petitions under § 236(2) without exploring the possibilities of reclaiming the 225 Barrone Street building for the debtor estate in light of the allegations made by counsel for the debtor corporations.

Nevertheless, the Court did not desire to delay the proceedings any longer than necessary if the allegations proved to be another "wild goose chase," ¹and hence declined to deny the trustee's petition at that time solely on the basis of the startling allegations without an investigation. Consonant with the purpose of Chapter X to effect a reorganization if possible yet mindful of the obligation to avoid undue delay, the investigation was commenced as soon as practicable, and it swiftly led to the reclamation suit which was granted every priority on the Court's docket. Contrary to expectation, it soon became obvious that the suit would be an extensive trial, shrouded with factual intricacies and intrigue. The delay caused by this protracted litigation could not be avoided. And unfortunately the illness of the Court only increased the delay. It did, however, provide the opportunity for calm reflection free from the continuous and embroiled barrage of issues constantly parading to the Court. It was realized, first by the trustee, and then by the Court, that the notion of an "englobo" plan of reorganization, which, of course, would achieve the ultimate result and which the debtor corporations had constantly urged upon the Court and supported with solemn promises and inducements and upon which notion the Court was still operating, must be abandoned. All of the prior attempts to formulate a plan of reorganization had been based upon that notion, and all had failed. At the time, of course, no one knew that such a plan could not be worked out, and we could not shut the door to such an attempt. With reflection, however, the reason became apparent. The debtor corporations can be reorganized only through the injection of capital from an outside source (this was obvious from the outset) and while the debtor estate does hold some attractive property, it owns too much "deadwood" to attract the necessary capital to revitalize the entire operations. The bitter is simply too much for the sweet. With this realization came the decision to disgorge the nonproductive and heavily encumbered property and to retain only that property which was able to pay its way. If a plan of reorganization of any considerable significance for the debtor corporations is to be effected, it will be based upon the properties which are the subject of various reclamation suits now pending, particularly and most importantly, the building at 225 Baronne Street. All of this litigation could conceivably consume several years before finally terminated, and, of course, the outcome is uncertain. Thus, not only should the absolute "deadwood," which would have no place in any plan of reorganization in any event, be disgorged, but also that marginal property which is not essential to a plan, although not necessarily detrimental to a plan, and which is only increasing the indebtedness of the estate at present.

Consistent with these postulates, the Court entered an order on September 16, 1968, granting the trustee's petition to abandon and disclaim the property known as the Le Richelieu Hotel, which petition had been taken under advisement on May 6, 1968, in light of the allegations as to the transfer of the 225 Baronne Street building when the Court was operating on the "englobo" theory; and on October 11, 1968, the Court entered an order granting the trustee's petition to adjudicate Place Vendome, Inc. bankrupt, and placed that corporation into ordinary bankruptcy proceedings pursuant to § 236(2); and on October 31, 1968, the Court granted the trustee's petition, filed on October 11, 1968, fixing January 31, 1969, as the date for the trustee to file a plan of reorganization as to Southern Land Title Corporation, The Five Flags Building, Inc., Puritan Oil & Gas of New England, Inc., Bourbon Kings Hotel Corporation, and Sotan, Inc., or reasons why a plan cannot be effected pursuant to § 169 of the Bankruptcy Act, 11 U.S.C. § 569. Inasmuch as the trustee now has until January 31, 1969, to prepare and file a plan or give reasons why a plan cannot be effected, his former petitions to dismiss the proceedings as to Southern Land Title Corporation, Five Flags Building, Inc., and Puritan Oil & Gas of

New England, Inc., or to adjudicate those corporations bankrupt and place them into ordinary bankruptcy pursuant to § 236(2), which petitions were heard on April 22, 1968, are now moot, and it is therefore ORDERED that said petitions be, and they are hereby, DENIED. Similarly, IT IS THE FURTHER ORDER OF THE COURT that the motions of National American Bank and the National Bank of North America, which were urged to the Court on February 29, 1968, to place these proceedings into ordinary bankruptcy be, and the same are hereby, DENIED.

We now proceed to give written reasons for extending the date for the trustee to prepare and file a plan of reorganization. On December 12, 1967, the Court signed an order fixing February 9, 1968, as the date on which the trustee was to prepare and file a plan of reorganization or report the reasons why a plan could not be effected pursuant to § 169. On February 9, 1968, the trustee was engaged in negotiations with one K. K. Basu with an eye toward formulation of an "englobo" plan of reorganization. At the hearing on February 9, 1968, the attorney representing the Basu interests outlined in skeletal form the plan of reorganization as envisioned by those whom he represented. The details were not ironed out, however, and it was necessary to extend the date on which the trustee was to submit a plan to February 29, 1968. Of the throng of creditors represented at the hearing on February 9, only the National Bank of North America opposed the extension. At the hearing on February 29, the trustee's attorney submitted the so-called Basu "plan" to the Court but refused to adopt or approve the "plan" for various reasons, including the fact that the so-called "plan" violated the absolute priority rule and the fact that it encompassed Sam Recile's personal debts. We indicated at the hearing on February 29 that we would examine the "plan" but would not waste additional time and cause further delay by calling a hearing on the "plan" if an examination revealed that it was obviously defective. Not only did an examination of the "plan" prove it to be defective for the various reasons pointed out by the trustee's attorney, but the "plan" was never supported with any financial commitments. Consequently, a hearing was never called on the Basu "plan," and the time for the trustee to file a plan expired.

On October 11, 1968, the trustee filed a petition to fix a new date for the trustee to file a plan with respect to Southern Land Title Corporation, The Five Flags Building, Inc., Puritan Oil & Gas of New England, Inc., Bourbon Kings Hotel Corporation, and Sotan, Inc. In essence, the trustee's petition was bottomed upon two factors: (1) the various suits pending to reclaim extremely valuable property for the debtor estate, particularly and most importantly 225 Baronne Street; and (2) the "deadwood" and marginal property are all under pending petitions filed by the trustee to either sell or abandon and disclaim leaving only that property which produces sufficient income to pay their cost of operation, taxes, insurance, and interest on the first mortgage indebtedness. The trustee's petition came on for hearing on October 31, 1968, and the Court granted the petition extending the date within which the trustee is to prepare and file a plan of reorganization or report reasons why a plan cannot be effected to January 31, 1969.

The National Bank of North America was the only party objecting to the extension of time. Several different reasons were urged in support of the Bank's opposition, all of which are without merit. The Bank asserts that the change of circumstances brought about by the divulging of information which resulted in the initiation of the reclamation suits involved matters which the trustee knew or should have known long ago. May of 1968 was the earliest date on which the trustee was made aware of the information supporting the reclamation suits. Prior to that time neither the debtor, nor the creditors, nor any other interested party had made these facts known

to the trustee in spite of his diligent quest to become familiar with the tangled web of facts surrounding the debtor corporations' affairs. To hold that in such circumstances the reorganization trustee must view each and every act of the debtor with suspicion and precipitate court hearings with respect to the same would impose an intolerable burden upon the trustee, the Court, and all parties concerned since most of this would be wasted time, energy and money. Rather, it is only reasonable to expect that one of the parties involved, particularly the debtor, would make this information known to the trustee at the earliest possible date so that he could pursue the remedy. This assertion of the Bank, then, is meritless. Yet even if it were true that the trustee should have known of these facts long ago, it may constitute grounds to question the trustee, but would in no event justify the refusal of the Court to consider the circumstances as they are now known to exist. While the Bank does not suggest that the trustee has been derelict in his duties, it does argue that the trustee did prepare a suit to reclaim 225 Baronne many months ago but never filed the suit, and that this therefore supports its contention that the trustee knew about these facts long ago. In making this assertion the Bank ignores the fact that that suit was prepared at the insistence of the debtor corporations and was based on grounds totally different than those upon which the present reclamation suit is based, and that the suit proved to be meritless upon an examination and was therefore never filed by the trustee.

The Bank also argues, with obvious reference to 225 Baronne, that the trustee's reclamation suits are too speculative to furnish a basis for refusing to dismiss these proceedings. We are unable to agree with this contention because the evidence which is now in the record on the 225 Baronne suit clearly shows that the reclamation suit is not merely "speculative." Further, at the time that the extension was granted, the Court was aware that steps had been taken to compromise the reclamation suit of 225 Ba-

ronne Street. While such steps may have little or no significance in an ordinary civil suit, due to the feelings engendered on both sides of this suit and the personalities involved, this effort would not have been made had it not involved a sincere and genuine attempt to resolve the differences between the parties and had it not been fraught with excellent chances of success. Subsequent to those initial steps, the trustee and his attorney met and conferred with the parties involved and have reported to the Court that a very real and excellent possibility of compromising the suit does exist, and all parties concerned are enthusiastic about this development. Consequently, on November 4, 1968, the Court continued the resumption of the 225 Baronne Street suit for two weeks for the very practical reason that the attorney for the trustee cannot be antagonistic in cross examination while at the same time attempting to reconcile the matter with those same persons under the circumstances as they do exist. The two-week continuance of the suit should allow ample time to negotiate the details of the compromise, and, if for some reason the compromise does not materialize, should allow ample time to complete the reclamation suit and receive a decision thereon and submit a plan on or before January 31. Even apart from the compromise negotiations, the evidence already presented in the reclamation suit clearly and unequivocally demonstrates that the allegation that the suit is too speculative to warrant continuing these proceedings is meritless.

The Bank next asserts that the change of circumstances does not justify the retraction by the trustee of "solemn judicial averments and sworn testimony." This obviously refers to the § 236(2) petitions formerly filed by the trustee herein. Suffice it to say that we believe that the new developments do warrant such action and that the trustee would be derelict in his duties if he did otherwise under the circumstances.

 The Bank then contends that the new course of action pursued by the trustee with the sanction of the Court to

disclaim and sell the burdensome property will not lead to a plan of reorganization but, instead, will lead to a plan of liquidation. Not only does this assertion ignore the law, but it ignores the facts as well. Only a portion of the estate is being liquidated; the property which is being retained greatly exceeds in value the property which is being disgorged. The law has always permitted the abandonment or sale of onerous property. In Re Dania Corp., 400 F.2d 833 (5th Cir., September 17, 1968) ; In Re Sire Plan, Inc., 332 F.2d 497 (2d Cir. 1964), cert. den. 379 U.S. 909, 85 S.Ct. 206, 13 L.Ed. 2d 181; In Re V. Loewer's Gambrinus Brewery Co., 141 F.2d 747 (2d Cir. 1944) ; 4A Collier on Bankruptcy ¶ 70.-42; 6A Collier on Bankruptcy ¶ 8.07[2] ; 6 Collier on Bankruptcy ¶ 3.27; 11 Remington on Bankruptcy §§ 4400–4400.1. And § 216(2) of the Bankruptcy Act, 11 U.S.C. § 616(2), permits the reorganization of only a part of the property of the debtor. In fact, as stated above, it was the retention of the burdensome property which has thwarted all prior attempts to effect a plan of reorganization. In short, it is now clear that under the circumstances Chapter X demands this course of action; otherwise, no plan will ever be forthcoming.

Next, the Bank opposes the extension on the ground that it is losing money because the properties mortgaged to the Bank are depreciating and rapidly deteriorating and the Bank is losing interest. This contention, however, is without merit for the simple reason that the Bank admitted on oral argument that all of the property mortgaged to it, other than the Bourbon Orleans Hotel which, as an attractive going concern, is certainly not deteriorating, is under a presently pending petition to sell or to disclaim. It would probably take a longer period of time for the Bank to acquire its property if these proceedings were converted into ordinary bankruptcy proceedings at this time than it will take via the disclaimers and sales. We certainly would not dismiss the proceedings outright. In disposing of this contention, we certainly

do not wish to appear callous to the Bank's position. Quite the contrary, for we have been quite concerned about the loss to the secured creditors each and every day since the inception of these proceedings. However, on the other hand we simply cannot ignore the law as written by Congress. We are constrained to give due regard to the purposes of Chapter X to effect corporate reorganization if possible. A successful plan of reorganization benefits not only the unsecured creditors and junior secured creditors, who may receive nothing if reorganization fails, but also the senior secured creditors who must be paid in accordance with the absolute priority rule and who may suffer losses if foreclosure is their only remedy. The debtor corporations also benefit through a successful reorganization, and in this particular case, due to its enormity, the community of New Orleans as a whole would benefit tremendously. Originally we felt that an "englobo" reorganization was possible. A number of secured creditors felt the same. Under those circumstances the law required us to explore the possibilities. We did, and it proved unsuccessful. We now truthfully believe that reorganization is possible under the circumstances—and present belief is not easily reached in light of prior failure—but that it cannot include the onerous property previously sought to be included. The fact that the secured creditors have lost substantial sums of money cannot be undone at this time. Unfortunately, foresight is not as keen as hindsight. We can only assure the secured creditors that neither the Court nor the trustee desire to delay these proceedings any longer than necessary. While it would be much easier to place these corporations into ordinary bankruptcy, we feel that we would be shirking our responsibilities under Chapter X to do so and would be acting contrary to that law.

The Bank's final contention is also without merit. The Bank points out that the time for filing a plan of reorganization or report of reasons why a plan could not be effected expired long ago.

Although the Bank did not develop the argument and did not cite any authority, we construe this to present the question of whether the Court can now extend the time for the filing of a plan. Our starting point is § 169 of the Bankruptcy Act, 11 U.S.C. § 569, which requires the Court to fix a date for the trustee to prepare and file a plan of reorganization or a report of his reasons why a plan cannot be effected. That date expired on February 29, 1968. We then turn to § 119 of the Bankruptcy Act, 11 U.S.C. § 519, which provides:

> "Whenever under this chapter the court is required or permitted to fix a time for any purpose, the court may upon cause shown extend such time."

The question is whether the court may now extend the time for the filing of a plan, even though the original time for the filing of a plan has long expired. The terms of § 119, while not specifically addressed to the problem, are extremely liberal and permissive, and, we believe, authorize the extension at this time. The commentators have the same view of the liberality of § 119 as we do. Collier says of § 119: "Its purpose is to afford necessary flexibility." 6 Collier on Bankruptcy ¶ 3.38, p. 687. And again: "[A]mple power exists to permit an extension of that time [for the filing of a plan] when desirable or necessary." 6 Collier on Bankruptcy ¶ 7.25, p. 1247. Remington says that § 119 gives the court "the widest possible discretionary power in granting extensions of time * * *." 11 Remington on Bankruptcy § 4405, p. 98.

Our conclusion is supported by a consideration of several other provisions of the Bankruptcy Act in light of basic principles of statutory construction. For example, § 39(c) of the Bankruptcy Act, 11 U.S.C. § 67(c), permits review of a referee's order upon a petition filed within ten days after the entry of the order or within such extended time as the court may allow upon a petition filed *within the ten-day period*. This section expressly requires that the extension must be granted prior to the expiration of the

original time period. If Congress had intended the same for § 119, it would have also expressly provided for it. This is fortified by the discussion at 2 Collier on Bankruptcy ¶ 39.20[1–4] which indicates that Congress amended § 39(c) in 1960 to abrogate the judicial interpretation of the former language of the statute. Formerly that section only required that the petition for review be filed within ten days after the entry of the order and was somewhat similar to § 119, although not nearly as permissive, in that it allowed an extension of time but did not expressly require that the time be extended prior to the expiration of the ten-day period. Numerous courts had construed § 39(c) to permit an extension of time upon a petition filed after the expiration of the ten-day period. Congress made its intent clear in 1960 by amending § 39(c); it, however, left the permissive language of § 119 unaltered, and thus presumably paved the way for the same judicial interpretation of that section as had formerly prevailed under § 39(c). Section 57(n), relating to the filing of proofs of claims, is another section containing an express requirement that the application for an extension of time must be filed prior to the expiration of the original period of time. It is thus clear that Congress is aware of the problem of obtaining an extension of time subsequent to the expiration of the original time limitation and knows how to prevent such an extension when it so desires. Because § 119 contains no such express provision limiting extensions of time, we can only conclude that Congress did not mean to so limit that section.

We have discovered only one case, and it was quite by accident, in which the court extended the time to file a plan under § 169 after the previously fixed date had expired without an extension. Silver State Sav. & Loan Assoc. v. Young, 252 F.2d 236 (9th Cir. 1958). The extension of time was not presented as an issue in that decision, however, and was revealed only through the recital of the facts in the opinion. It does reflect, how-

ever, that precedent does exist for our decision.

Moreover, in discussing § 196 of the Bankruptcy Act, 11 U.S.C. § 596, which requires the judge to fix the time within which proofs of claims may be filed in reorganization proceedings [§ 57(n) is expressly made inapplicable to reorganization proceedings by § 102], Collier points out that the judge may, in his discretion, extend the date for filing proofs of claims by virtue of § 119 even though the bar date has previously expired. 6A Collier on Bankruptcy ¶ 9.03; see also 11 Remington on Bankruptcy § 4519. In this very proceeding, we have permitted a number of proofs of claims to be filed even though the bar date had previously expired. We can see no reason whatsoever for not giving § 119 the same effect with respect to extending the date for filing a plan under § 169 under the circumstances of this case. To hold otherwise would compel the debtor corporations to forego the now very imminent possibilities of corporate reorganization. Our interpretation of § 119 is thus certainly consonant with the purpose of Chapter X to effect a corporate reorganization when possible.

■ Having disposed of the negative aspects of our decision to extend the date for filing a plan, which were presented through the sole opposition of the National Bank of North America, we now turn to a positive consideration of our decision. The time for the filing of a plan of reorganization should be extended when there is a reasonable likelihood that a proper plan of reorganization may be forthcoming within a reasonable time. 6A Collier on Bankruptcy ¶ 12.02. This is necessarily a factual determination. We firmly believe that the facts and circumstances presently existing in this case fully warrant our decision.

It is generally agreed that a successful reorganization of any consequence hinges upon the recovery of the building at 225 Baronne Street. All of the potential plan proponents who have been attracted to this case have deemed the inclusion of

225 Baronne essential to any possible plan. (Prior to the disclosure of the information leading to the reclamation suit, the potential plan proponents had all proposed to acquire the building from its present owner in connection with the revitalization of the property held by the debtor estate.) In view of the importance of recovering that property, it is certainly proper to grant an extension of time for the filing of a plan pending the determination of that lawsuit. In Re McGann Mfg. Co., 92 F.Supp. 595 (M.D.Pa.1950), affirmed, 190 F.2d 845 (3rd Cir. 1951), is probably as close to this case as any case could be. In *McGann* the reorganization proceedings were commenced early in 1946. The time for filing a plan of reorganization had been extended a number of times but no plan was ever forthcoming. The principle barrier to a plan of reorganization was the debtor's uncertain financial condition due to the fact that the trustee was prosecuting a suit under the Lucas Act (War Contracts Hardship Claims Act), 41 U.S.C. § 106 note, for $650,000. The Lucas Act suit had been commenced in 1946. Four years later, in 1950, the court denied a creditor's motion to dismiss or to adjudicate the debtor bankrupt and place it into ordinary bankruptcy proceedings under § 236. The district court's ruling was obviously predicated on the pending Lucas Act suit. The Third Circuit Court of Appeals affirmed the district court on obviously the same basis. The trustee's attorney had stated on oral argument before the Court of Appeals that the trustee could formulate a plan of reorganization within ten days after a decision was rendered on the Lucas Act suit, even an adverse ruling, and the trustee did recover a $57,000 judgment in the suit subsequent to oral argument on appeal but prior to the decision. These factors, however, did not govern the court's decision. This is clear from the opinion itself as well as the opinion in an earlier appeal in the same case when the Court of Appeals bluntly stated: "Any plan of reorganization must await the final disposition of that

action." 188 F.2d 110, 111 (3rd Cir. 1951).

The facts here present an even stronger case for the continuation of the proceedings than *McGann*. These proceedings have been pending less than two years, not five years as in *McGann*, and the lawsuit has been pending only five months, not four years as in *McGann*. Further, the chances are excellent that the lawsuit may be compromised without further litigation. The significance, both legal and factual, of the pending suit to reclaim 225 Baronne is clear.

Further, we fail to see how this additional delay will seriously prejudice the secured creditors. All of the deteriorating, nonproductive and heavily encumbered property has been placed under various petitions to disclaim or to sell. All of these petitions, save the Le Richelieu disclaimer, have been referred to the Referee in Bankruptcy as special master to hear and report under § 117 of the Bankruptcy Act, 11 U.S.C. § 517, and are presently pending before the Referee. The trustee has retained in the debtor estate only that property which is productive and able to meet its expenses. While it is true that some of the retained property may not generate sufficient income to meet interest obligations entirely, the creditors' securities are, nevertheless, not being impaired. None of these secured creditors objected to the extension of time to file a plan. We believe that they well recognize the desirability of continuing these proceedings pending the determination of the 225 Baronne Street suit for their own financial interests as well as the financial and economic interests of the community as a whole. Further, even if the debtor estate fails to acquire 225 Baronne Street through litigation or compromise, most of the retained property will be capable of reorganization, although on a much smaller scale.

The foregoing adequately explains our decision, we believe, with respect to the extension of the date for filing a plan of reorganization with respect to all the proceedings save Bourbon Kings Hotel Corporation. For it is obvious that if valuable properties are reclaimed by the subsidiaries of Southern Land Title Corporation it will inure to the benefit of the parent corporation and greatly enhance its chances for corporate reorganization. While we have concentrated on the reclamation of 225 Baronne Street, which is generally conceded to be the most important suit psychologically as well as economically, we have not overlooked the pending suits to reclaim other property for other subsidiaries such as the suits pending to recover the Sotan Properties for Sotan, Inc. We have stressed the 225 Baronne Street suit, however, because that is the most crucial factor in our decision.

We granted the trustee's petition to extend the date with respect to Bourbon Kings Hotel Corporation and denied the application of the National Bank of North America to dismiss that proceeding under § 236(2) simply because the trustee is very close to formulating a proper plan of reorganization for that corporation. The only asset owned by Bourbon Kings Hotel Corporation, other than the Le Richelieu Hotel, which has been disclaimed, is the Bourbon Orleans Hotel. This is an attractive and valuable property located in the heart of the French Quarter and operated as a hotel. We can perceive no reason, financial or otherwise, why this corporation cannot be reorganized, particularly since the "englobo" theory has been discarded. The trustee has constantly kept the Court informed of the progress of the negotiations and the details of the plan to be proposed. The plan, if successful, will not only pay off the secured creditors but will also enable the unsecured creditors to realize a portion of their investment. Under such circumstances, we are firmly convinced that additional time should be granted to the trustee to perfect and file a plan of reorganization with respect to Bourbon Kings Hotel Corporation.